Without further ado, we'll start with the first case on our argument calendar, which is United States v. Obendorf. Correct, Your Honor. And for the appellant, we have Mr. Greg Silver. Silvey. Oh, I couldn't, oh. So, Mr. Greg Silvey. Pleasure to have you here. Go ahead. Thank you, Your Honor. Please proceed. Thank you. May it please the Court, Counsel. Good morning, Your Honor. I have the oddest case of my career. We have a case with a completely blank slate. There's no law on this anywhere, a few unpublished decisions. I have the dubious distinction of representing the only man in America and probably the world who has ever received what will be a jail sentence for baiting ducks. We have a situation, we have a regulatory scheme that nobody can agree how it works. In the district court, we have the government volunteering that there is an agricultural exception to the prohibition against baiting ducks. They come up with this idea. They say this can be a safe haven for Mr. Obendorf. They produce jury instructions with this. They go out and find some extension specialists and put them on their witness list, call them during trial. Then, when we appeal the fact that the district court did not implement the agricultural exception the way we believe it should have been, now on appeal, the government says, well, the agricultural exception doesn't apply to baiters. It only applies to hunters, so that would be harmless error anyway. What's your position on that, Counsel? Does it apply? Yes. Yes, with an explanation. I understand how the reg is written, and it's, you know, not written for lawyers. It's, you know. Why does it apply? Your time's ticking, so why does it apply? It applies because, well, we have a district judge that applied it. It applies because that's what makes sense. It applies because there was the shift in 98. Baiting previously was not illegal. Right. And so that was changed, and because there was kind of two ships passing in the night, the regulations are being amended at the same time there's a new statute coming out that criminalizes baiting. I mean, that explains why baiting does not get expressly mentioned in the regs, but as I briefed it, the logical inconsistencies of having an agricultural exception for only the hunter and not the farmer does not make any sense, where the same farming practice, it would be a defense to the hunter to be there. It would not be a defense for the farmer to have done that, but if the government were to charge aiding and abetting baiting, which apparently happens a lot, a lot of these cases seem to be out of the South, and they're mourning dove cases. And some districts seem to charge aiding and abetting baiting, or I'm sorry, hunting over bait, all of a sudden then it's a defense again. And a lot of my arguments in this case are just straightforward. It just can't be that way. What about the express language that we have to work with, counsel? The express language says what, I think it's something to the effect of what manners of take are illegal. Not bait. Correct. If you lose on this argument, then what? If we decide that everybody in the district court made the same error, then what? What should we do? I think it still gets reversed and sent back because, I mean, this is, invited error doesn't seem to be the word to explain this, but, I mean, the government came up with this. I mean, the defense. It seems like the government just took on a greater burden. Right. No, they took on. So what's. . . A defense was based on it. I mean, this is the leading endowment. Wait, wait, wait, wait. The government, it seems to me that the government took on a greater burden. It didn't have, as I read the statute, they didn't have to do what they did. But they did. And I want to know why that was, why that error was not harmless. Because he created a defense based on it. And I'm not trying to. . . Well, what was the defense based on that? I mean, the evidence here was pretty strong from the witnesses who testified that a reasonable jury, I don't care how you instruct him, could conclude that he was So. . . So explain to me why it's not harmless, okay? Because when the full trial transcript is read, I mean, the full defense is going to be getting expert witness testimony from the extension agents on the stand that these various practices are recommended. So, I mean, just so when half of the defense is being removed, I mean, we can't look in retrospect. Well, some of those witnesses were on the stand. Right. And they could not be cross-examined. The judge. . . Right, would not let. . . The judge would not let the defense cross-examine the extension specialists as to whether these would be had to precede the farming conduct, which was the big point of the appeal up until the respondent's brief. So the judge would not let them testify to that. I mean, that gut the prepared defense. So at this point, I mean, I don't mean to make. . . Okay. So that evidence would have allowed a reasonable jury to conclude what? The jury could have concluded that what happened would have followed a official recommendation, and therefore the agricultural exception would have applied. So what he was doing was consistent with what the recommended practices were at the time? Correct. And those recommended practices were to harvest your field the way he did? Correct. But it would have produced the defense. And I'm not trying to make light of this, but if we remember the line from decades ago, the most terrifying words in the English language are, I'm from the government and I'm here to help you. And here we have the government saying this is a safe haven for Mr. Obendorf if he proves this. And now here we are a couple years later and the government saying the same party. I mean, I know that the Department of Justice in Washington thinks they're not the same as the AUSAs in the sticks in Boise, but it's the same party. It's the United States. They changed their mind about what they think this means. Did Mr. Obendorf run any other defenses? Well, he had a few witnesses that were testifying about how much corn a combine could leave, that here's a field where just a bad driver could leave this amount. Is there any testimony about how long the corn was left in the field? I don't recall any testimony like that. The point is there are other defenses to this. He chose a primary defense. I mean, there were some secondary things going on, but he chose a primary defense that all of a sudden if this court says it doesn't apply, he should get to go back and use a defense he could have used. Counsel, let me ask you a question. Yes, sir. What defense did he have that he could have asserted that was perhaps not pressed because of this one? Well, I mean, he could have. There were a few witnesses, but there could have been. By the way, I wasn't trial counsel. But there were, you know, more people testifying. Okay. So back in the bad old days. Counsel, your time is ticking. What's your answer to Judge Gould's question? Yes. It's the other farmers testifying. It wasn't a yes or no. It was what other defenses did he have? Other farmers testifying, these are bona fide ways of farming. That's the same defense. No, those are distinct. Different witnesses. Different witnesses, which the judge was saying would be allowed. Okay. So we're not talking about witnesses. Judge Gould's asking about what other defenses were raised. That it wasn't that. Well, let me give you an example. I thought that I read that there was evidence that some witness who was involved in the harvest for your client said that the client had told him to harvest in a way to leave a lot of grain on the field. So, yes, a witness said that he told him that. Yeah. So what's the defense, if that's true? Well, it wasn't true. The defense wasn't true. I mean, it was a dirty case. I mean, the one primary state's witness, I mean, says he's in a full-blown feud with Mr. Obendorf for turning him into fishing game. We have, you know, felon witnesses. We have other witnesses who are game violators. I mean, while this is a duck case, it looks a lot like a drug case in terms of the players of the government's witnesses. I mean, so, I mean, basically the classic snitch crosses weren't really being done because they thought they had a defense up until during cross-examine of these witnesses. All of a sudden, they can't cross them the way they thought and couldn't get the evidence in they thought they were going to be able to get in. The they in this sentence is you, right? Trial counsel. Yes. Okay. Your client, right? Yes. Okay. All right. Okay. Mr. Silvey, with our questions, we took you through all your time, and you may want to do some rebuttal. So I'm going to add a minute to your time so you can plan to make a rebuttal argument. Thank you, Your Honor. We'll ask for the government. We have Ms. Chilakamari. Perfect. Thank you, Your Honors. My name is Varu Chilakamari for the United States. Your Honors, in this case, the judge below presided over a seven-day jury trial and carefully went through all of the instructions and the evidence before him. There was a tremendous amount of evidence showing that Mr. Opendorf had a specific intent. This is a specific intent crime under Section 704B2 of the statute. And they showed beyond a reasonable doubt that Mr. Opendorf scattered the bait for the purpose of allowing others to come in and hunt. Counsel, in order to bait, the corn has to be left in the field for 10 days, right? Yes. Was that shown? Yes. Could you give me just the record sites to show that you tied that up to show that there was an intent to leave the corn in the field and permit hunting during that interval? The three – I'll have to go to the brief, Your Honor, but the three – for the 2013 baiting, which was what was the bait at issue, there were three hunters that baited within the time period from when they discovered when Agent Cabasa and Agent Merrick found the corn on the field. And then they put the camera in. They saw the corn literally on the field. And then within 10 days, three hunters came in and hunted. Okay. So that's what I need, just the interval. Because I'm concerned that the government – your time is ticking. So I'm just concerned that the government has really switched gears here. The exception we're talking about was in the indictment from the very beginning of the case. And defense counsel has made clear that his argument is that there could have been perhaps another defense. And I'm trying to figure out what that might have been. Do you have a response to that? I think the only other defense, if you agree that the safe harbor does not apply to hunters, is that he didn't have the specific intent. What I wanted you to respond to is my concern that the government is – that this could be interpreted as a shell game, that the government – this is a moving target for him. Why should I not be concerned about the unfairness of that? Your Honor, I think there was no prejudice below. The government did take on an extra burden, and I think that is because there was a – prior cases in this area were all under a prior regime where baiters were generally charged under aiding and abetting a hunter, and they were charged under the hunter's defenses, and those were what were looked at. But I think looking at this case now, we realize that actually this exception does not apply to baiters. But this Court doesn't, of course, have to get to that, because Mr. Opendorf was given the benefit of that safe harbor below. He was given the benefit of that, and we proved that not only did he have the specific intent to scatter the grain for the purpose of baiting, but that he also didn't have any agricultural purpose for baiting. Well, except that his argument, if you could respond, is that the witnesses weren't allowed to respond because the judge made a different ruling, which is, as you know, that the agricultural witnesses weren't allowed to respond because the judge had indicated that the practice, the official practice, had to be one that was already apparently committed to paper somewhere. Right. So I think there are two separate issues. If the safe harbor applies, which is how the District Court proceeded below, then the question is how does that actual regulation apply? And if you're going to rely on a recommendation as your safe harbor, the District Court correctly ruled that that recommendation ought to exist at the time that you rely on it. What, in writing somewhere? It can be in writing or orally. And it was our burden to prove that he didn't have that. It was our burden to prove that. Could it be a customary practice that existed at the time? Well, that was the old regime, but under the 1999 regulations, you have to show they wanted to have an objective standard. So you have to show that it was recommended by the State Extension Service. Well, but that's the whole rub, right? And that's what Judge Pius is really getting at. If the State Extension Service had said, yes, this is something that is dumb, this practice is customary, combining every other row, for example, what would be the right answer then? Again, the the I think that Judge Windmill was correct in ruling that for something to be conducted in accordance with an official recommendation, our argument is that recommendation had to exist at the time. But, counsel, you're not answering my question. Does that mean it has to be in writing somewhere or posted on a website somewhere? Well, the Extension specialists testify that they provide official recommendations in writing and orally as farmer education. So if somebody calls. So does it mean that has to have happened? They have to have written it in paper or actually given that advice to someone? That's what I'm trying to get at. Yes. That is how it was construed below, that it has to have been given officially, either verbally or on the phone. That is the position. And I think that. I think Judge Windmill said it had to have actually been given. That it had to be in existence, meaning it was given at some point to somebody. It was in writing or orally. And I think that makes sense that the recommendation has to exist at the time that you rely on it. From the hunter's perspective, if a hunter wants to figure out and gauge if he's exercising reasonable diligence and wants to figure out if he's hunting over a baited field and he sees corn scattered on the ground, then it makes sense from his perspective. Go ahead. Finish. It makes sense from his perspective that you would gauge your conduct based on the recommendations that exist at the time, not to think of what an ex post facto. Okay. But let me ask you this. So the government did take on this extra burden, right? Yes. But it seems like it should have, that this exception should have a part in this trial. In other words, what is his defense? He didn't have the intent. Is that it? Yes. He didn't have the intent because, what, he just his normal way of harvesting his fields? This is a specific intent crime. And so he could have shown, and the judge below said, he actually didn't have to show that he followed any official recommendations. He could have shown anything to rebut the specific intent for scattering the grain for this purpose. Suppose he wanted to show that what he did, the way he harvested his fields, was just, you know, the customary normal practices that everybody had recommended and he was just doing it. As a baiter. And there just happened to be extra, you know, just corn just happened to be left in the field. As a baiter, he certainly could have done that. This is a specific intent crime. So it's a high burden for the government. And he actually put on two farmers after the State Extension Service issue was resolved, he put on two farmers, Gerald Ruth and he put on his own cattle ranchers and others, to show that to try to explain what he might have been doing, that it might have been for some other agricultural reason. And that would have been evidence that the jury considered to rebut the specific intent. But that doesn't seem, I mean, the fact that he was following customary practices doesn't seem to be an affirmative defense. He doesn't, I mean, it may not be considered an affirmative defense. It would be evidence to rebut the strong showing of intent that we made. Not every crime necessarily has an affirmative defense, although. Well, if he tried to do that, would he be entitled to some sort of instruction about what normal practices mean? Not under the current regulations, because he wouldn't be. Why not? I mean, how is the jury supposed to know then? So let's say that this instruction didn't apply here. He calls somebody from, the government presents its whole case. He calls somebody from the state practices and has them tell the story that what he did was just normal practices. Yes. Just doing this. Wouldn't he be entitled to some instruction that he was following customary practices? Well, the court was, he gave instructions on the elements of the crime. Yeah, but the elements of the crime here, that the government has to negate the agricultural practices. But it also includes that the government has to show that he scattered the grain for the purpose of allowing others to come in and hunt. And so he could have shown, and he tried to show, that he didn't scatter the grain for that purpose. Instead, maybe it was experimental farming. Who knows? He could have provided any other reasons. And as defense counsel also notes, he spent a lot of time trying to rebut the credibility of the government's witnesses. So that also is a, you know, argument, if you will. But the point is that there was absolutely no prejudice here. So what was all the evidence that showed that he did this intentionally? There was three witnesses who testified that he told them to scatter the grain for the purposes of allowing the ducks to come in. He told DeBoer to operate this combine by closing up the sieve in the chaffer and letting 65 percent of the corn harvest. Right? As long as it was not, folks weren't allowed to hunt within 10 days, right? Yes. Yes. This rule has nothing to do with farming however they want to farm. Because I'm just going to say I think you're right. There was really compelling evidence that there was an intent to leave an excessive amount of corn in the field. I'm giving you that. I'm just concerned that the government tied this up because, after all, the government was operating under a misunderstanding of the law as well. Yes. I'd like to refer you to your question to our brief at page 6 and 7. We explain that November 20th, Agent Cabasa and others from the state Idaho game inspected the property, and they saw, as they described it, an exorbitant amount of corn kernel on the ground. The record sites for the – So that's the part I'm giving you. What I'm trying to – Sure. It's the other part of the equation. Yes, Your Honor. On page 7, we say four days later, November 24th, so that's four days after they saw the corn on the ground, that the field was flooded, and Obendorf invited in three hunters. He invited in Mike Rust. That's at ER 240. Rust testified that he had one of the best hunting days of his life. And then Obendorf invited Tony Alonzo that same day to hunt the field. That's at ER 322. Mark Howlett was another person that Obendorf invited to hunt the field on November 30th, again, within that 10 days period where they saw the grain scattered. And that's at ER 180. Thank you. Counsel, I just have one question. I'm going to take you a little over your time because we're giving some extra time to Mr. Silvey, too. My question is this. How do you answer an appellant's argument that if they had not been misled into thinking this was a defense, they could have spent more time, put more energy into developing strategies to discredit the witnesses for the prosecution? Well, there's no evidence that they had anything that they were hiding. There was any other evidence that they would have put forward to rebut the strong showing of specific intent in this case. There's basically no prejudice. They had an amount of time. This was a seven-day jury trial. They put on 11 witnesses. They put on several members of the employees, his cattle rancher, other farmers, both to show that he didn't have this intent to scatter the grain and to try to rebut the credibility of the government's witnesses. There's absolutely nothing here that they claim they would have showed to disprove the intent that Mr. Obendorf had to scatter that grain. And, you know, if there was an error, I mean, the error below, again, it would be looked at under the harmless error standard, and they have put nothing forth except a bald assertion that they would have had a different trial strategy. I also think it's important that the agricultural exception involves the same kind of evidence that you would use to rebut a showing of specific intent, the same evidence to show that you might have been following either an officially recommended practice or some other kind of agricultural practice. That's the same kind of evidence that would actually go to rebut any specific intent. So there was absolutely no prejudice below, and, in fact, we proved more than we needed to. Okay. Counsel, thank you very much. We appreciate your argument. Thank you, Your Honor. Mr. Silvey, could you, I said give him one minute. Let's see that. One minute on the clock. Thank you, Your Honor. Let's let him adjust that, though, to give him two minutes. Ah, thank you. I have bonus minutes. I think that, Your Honor, you hit the nail on the head here. I mean, I don't think that the government, again, what we call it, invited error, led down the garden path, whatnot. I mean, here several years later, in retrospect, I just think it's impossible for the government to say, beyond a reasonable doubt, that its error in coming up with that which claiming the exception applied to the baiter can be shown, beyond a reasonable doubt, to have not affected the verdict in this trial. Is it constitutional error, or is it just regular harmless error? Well, that's interesting. Normal harmless error would mean more probable than not, and constitutional error would be the unreasonable. Well, I want to go with constitutional error here. I choose that. But is that the one that applies? Well, we'll apply some amendment. I'll pass it around. Right. We'll call it constitutional error, for my purposes here, at least. Again, this is a rare situation where we're changing at this point. We simply don't know. I mean, something happened in the middle of trial that changed everything, and we don't know what would have happened but for. It's not like a few months left to prepare for trial. I mean, different things happened. The case could have been investigated different ways. Counsel actually got it wrong. I didn't say they spent a lot of time trying to discredit the snitch witnesses. They could have spent more time doing that, the investigation, treating it like the classic dope case. And, I mean, they called a couple farmers. I mean, it's a rural community. Also, it was interesting, one of the soil specialists was from that little town where Mr. Obendorf farmed. I mean, this isn't just grasping at straws or throwing out speculation. There actually was a way to present the defense if they would have known they needed to present that defense. Thank you. Your extended time, I'm afraid, has run. We appreciate the excellent arguments by both counsel. I'm also going to say thanks to Mr. Silvey for traveling from Boise, and thanks to Ms. Chilakamari for traveling all the way from Washington, D.C. Thank you, Your Honor. We appreciate it. Thank you. The case of Obendorf shall be submitted.
judges: Gould, Paez, Christen